We'll hear argument next in No. 2011-7079, WEST against the Department of Veterans Affairs. Robert Walsh Please the Court, I'm Robert Walsh. I've reserved three minutes, I believe, for rebuttal. Mr. West is here today, having traveled through a blizzard out in Utah to get here. There are three issues before the Court. I wanted to deal with Issue 3, which is the one that is really the most troubling in these kind of cases, which is the national security issue. Mr. West was in the Operation Dominic Pacific Range nuclear tests as an aviation maintenance person with DP-9, with the patrol planes. Patrol planes were out there not just providing security and keeping the Russian trawlers away and the native fishermen, but they were also flying through these clouds and gathering samples. They were part of the actual data collection and photography mission. He was servicing these planes right after they came through these radioactive clouds. He had served on the Lexington CV-16. He was injured there, hurt his back out there. But the real focus and the real problems we've had below, he's now at 90%. So as this case, when the case was down below, he was, I think, at 10% or something. And we've now, there's parallel proceedings going on here, and we've now gotten him up to 90%. He's on unemployability. Your issue is the date. So issue three, right, would impact that because it affects his effective date. And we made two arguments. One was the fact that the bar in 18 U.S.C. 793 was not advisory. I mean, this is absolutely a prohibition. This man was not debriefed. He was told, look, you say anything about what you saw out there on that island and what you participated in, and you get to go to Leavenworth and you don't collect $200. Now, it's difficult for us now, in the context of these times, to understand. You know, we haven't conducted a nuclear test since 62, 63. Nuclear secrets, some of them, and perhaps some that he held and holds now, are out on the Internet. But still in all, the Rosenbergs had been executed on June 19, 1953. This government was in a Cold War. The world was very confrontational. So what is your theory, then, that the statutory bar to the one-year date is obviated or superseded when there's a confidentiality agreement? What theory are you asking us to embrace in order to find for your client? Well, it left many of the radiation survivors, many of the participants, feeling that they had – that their right to access to any VA health care or disability claims was really attenuated because they would have to discuss that. The Secretary of Defense – I'm trying to find the piece of paper there. When did the department release your client from the 793 obligation? Ninety-six or something. Yeah, the Secretary of Defense wrote a blanket letter. But even at that point in time – When was the blanket letter? Secretary of Defense – Yeah, when? 1996. But what the Secretary didn't do, and what the VA didn't do, is go and notify all the survivors. Mr. West had become disabled in 1992. He was ill enough, and he was in desperate circumstances. He started getting health care from the VA, but he wasn't pursuing a compensation claim because he felt in order to do that, he was going to violate his trust. But he did come forward before the Perry Memorandum, right? Right, for health care in a very low grade. And then he was notified. He got in contact with the National Radiation Survivors, and the president of that organization informed him that, no, you can – here's a copy of this Perry letter, and you can say what you need circumscribed by not going into technical. You can't go off the health care reservation. You've got to stay inside the box. Let me bring you back to Judge Prost's question, which I have as well, which is that this looks like a difficult situation for somebody to be in. They can't make a claim, and without being able to make a claim, they can't start the clock running even on a later effective date and so forth and so on. But what is your theory as to how do we rule in your client's favor given the statutory limitations on our power to direct that the VA alter the statutory claim initiation law? Well, the only hook that I have here is – and it's one, and they're sort of inextricably intertwined – is this now concession we now get from DTRA where they can see that, oh, you were irradiated 550 rem. Or at least no more than 550, the way they put it. But you're in that zone. No, they just say no more than. Mr. West was medically evacuated to Hawaii a couple of days before the test ended. By the way, Mr. West is a son of the great state of Texas. He grew up on a small ranch, and he's descended from one of the original Texas Rangers. He's a real tough guy because I don't think too many of the sailors, soldiers, and airmen that he served with on that test are alive today. He may be the last man standing here. So you get in – I think when you announce this 550, and we've had all this trouble with DTRA. Now, the other aspect of this case is he needs the whole body radiation calculation to be made. And I certainly thought that we were going to get a remand for CAVC to generate that. Can I come back to the earlier effective date argument? Because I think Judge Gross had asked what your theory was. I think it's – excuse me. I think – and actually, coming around, I think it's vigil. I think once they issue that 550, we've got a new government. We've got to – remember, everything's in camera here. Everything's self-proclaimed. I'm trying to get your legal theory. I read your reply brief to say this effective date argument. You're not making an equitable argument. You're making a due process of law argument based on the lack of meaningful notice, i.e., being told earlier that he could file. So it was a violation of his federal due process of law rights. And that might take him only back to 1996, as Judge Bryson has said. We also have now – we have vigil. And, of course, vigil stands on 38 CFR 3.156C. I'm trying to get – I thought there was a difference in kind between your argument for an earlier effective date and your argument that there had been an inadequate assessment of the 550 information, including without limitation, your request for a whole body radiation estimate, which I couldn't find in the record where you never asked for that. But aren't those issues separate? Both are to be calculated. Yes, they're two separate tests. One is the surface radiation, and it's – this is science. And then you get down into the whole body, and that's the type that radiation oncologists get involved in, the part of your body that they're irradiating. They calculate very carefully the impact on your – Was there ever a request that you made to the RO for a full body radiation scan? Yes, and Mr. – Is that in the record? And Mr. West also communicated directly with DTRA about that. There's some letters and correspondence over the years. Did I miss something? I didn't see any discussion in the BVA or in the CABC opinions of the request for and the denial of the giving of a whole body radiation scan. I think it's couched in this term where they said, well, now we've got the 550 skin, and I think Mr. West, of course, he's a layperson, he's representing himself at the board, and he's saying, look, you've now conceded 550 or something in that zone, certainly not 0.0 and not 0.065. We're miles away from that now. So we need to look again, and he said there's a remand needed. There's more work to be done. One thing is the other – the flip side of that coin is the whole body assessment. I need that. And only DTRA has that data. That's still classified. And the other thing that he needs is he needs fresh medical examinations based upon the fact that we're now conceding, yes, you were on the island, and yes, you were seriously irradiated. And he presented with all the – he was evacuated for radiation sickness. What I'm trying to get at is, I mean, is that remedy lost to him? Could he go back to the RO now and say, you may not have been hearing me clearly enough before, folks, but I would like to have a full-body radiation exam? I have really tried to focus – Mr. Baynard represented him in his first two trips to CAVC, and due to illness and retirement, he dropped out. So I'm pinch-hitting. I came in just as the case came to court. The record was closed below. Mr. Baynard had been, I think, Assistant General Counsel, Deputy General Counsel at NRC, and he's very knowledgeable in this radiation. This is my first radiation case. But in looking at it, I clearly perceived that we needed more work there. And we went back, and in fact, Mr. West petitioned the regional office director to send his case down to Jackson, Mississippi, which is home court for all the radiation assessment, and they refused to transfer the case. So now we haven't sought mandamus to command that be done, because we've been busy working on the other aspects of the case. As I say, we've now got him up to 90% with unemployability. So we've got money. We've got health care for his spouse now. But now we're looking at the earlier effective date issues. And also, he hasn't been able to really adjudicate his internal problems, and that goes to issue one. That's the duty to assist the inadequacy of these exams. No one can address his argument, which is that his joint pain, his whole body joint pain, where his joints have dried out because of the radiation and all those internal diseases he's suffered from, they're directly related. They're the same symptoms you get when you have radiation cancer treatment in that narrow spot of your body. On this issue, though, don't you run into the problem. I'm sure you disagree with Dr. Sadowick's analysis. But Dr. Sadowick does say that his assessment is that this is normal degenerative joint condition that's not inappropriate or unexpected in a man of this age. And he also says, again, I'm sure you're going to say I heartily disagree with his having said this, but he does say, and I did look at the C file. And the C file at that point did have the 550 rem maximum exposure figure in it, as I understand it. So as this case comes to us, it's hard to say anything. We're not in a position to say, well, Dr. Sadowick just didn't do a good enough job. Mr. West says, and of course this is extrinsic, but Mr. West says he had that letter in his hand. He showed it to this man. And there's not one mention of the 550. There's nothing. There's not mention of that letter, the date of that letter. But he does say that he reviewed the evidence of radioactive exposure. Well, and he said that Mr. West could point to not one example. And in fact, the record, I think, is fairly replete with all the Operation Dominic information and everything of what he and his shipmates endured. But given our narrow jurisdiction, which you're very familiar with, I know that we are not in a position to reexamine facts, and we're getting really down in the factual weeds here. What is the legal point that we can settle on as a basis for reversal based on Dr. Sadowick's analysis? Or put another way, doesn't Dr. Sadowick's analysis, as inadequate as you might think it to be, doesn't it satisfy the requirement of a remand from the board to consider anew your client's condition? Judge Ivers, who heard this case below on assignment, had remanded this case originally. Mr. West's position is that he did not enforce his own remand order and that the radiation analysis wasn't done. And the other physicians, and I'll give Dr. Sadowick this credit, until he has in his hand the DTRA whole body radiation calculation upon which to review the peer-reviewed medical research and the existing radiation oncology standards for the research, what we know about the effects, he can't form, he doesn't have all the evidence upon which to form a reasonable opinion. So I don't think he really dodged the question, but I also don't feel that he properly did an adequate history and physical, and I felt that he flunked STEFL on those grounds. Now you alluded, I think, earlier, and I just want to make sure I have it right, you alluded to the whole body radiation assessment as being something that was in the possession of the Department of Defense? Well, all of the data from which is the data set is there. I see. So in other words, what you're saying is they could do an estimate of the whole body as opposed to the skin only based on the data that they have regarding the test, and that's not that they have a piece of paper somewhere that says this is the number for Mr. West. And I don't want to mischaracterize it, but basically the secretary is saying that this isn't a radiogenic case, but this is a case in which the joint pain and the other secondary effects of radiation and primary effects of radiation which aren't listed, which aren't enumerated as presumptive, are still available on a direct basis. But without that high radiation dosage, that whole body number, a radiation oncologist, and we spoke to several, said we do not now have that classified data. SAIC, the contractor, has to crank the handle and spit out a number for Mr. West. Then we can go and get an expert medical opinion. My time is expired. We'll hear from the government now, and we'll give you a couple of minutes of rebuttal if you need it. Ms. Goodmiddle. May it please the Court. I'd like to begin with a factual clarification, and that is that Mr. West has, in fact, received a whole body estimate. The Veterans Court's opinion on page 2 explains, and it's near the bottom of the page, that in September of 2006, which was before Dr. Sadovich's exam and in the claims file at the time of his exam, the DTRA provided a reconstructed whole body dose estimate for the appellant of zero rem. And then a few months— Wasn't that because they had lost the badge or they couldn't figure out why was that done? That wasn't an assessment based on statistics. As I recall, they said, well, we couldn't find your badge or we couldn't find something, so we're giving you a zero. Well, when the Defense Threat Reduction Agency originally looked at the— considered Mr. West's argument related to the badge and found that that was essentially a false positive, that the badges had numerous problems with them and for that reason did not credit the reading, which there was a badge that DTRA considered that had a .065 rem reading, and that amount is referenced near the beginning of page 2 of the Veterans Court's opinion as the December 1994 radiation dose estimate. Those dose estimates were then revised in 2006, and Dr. Sadovich made his evaluation based upon the claims file, which at that time included both of those radiation estimates. And to the extent that Mr. West challenges the adequacy of those opinions, the medical opinion or the correctness of DTRA's dose estimate, those are factual matters that do not fall within this court's jurisdiction to review. Turning to Mr. West's argument related to the effective date, we do agree that to the extent he's asserting the Veterans Court misinterpreted 5110, the effective date statute, that is a question that falls within this court's jurisdiction. However, this court has been clear, most notably in the McKay decision, that 5110 is not subject to waiver for equitable reasons. Congress clearly set in 5110 the date of the claim as the earliest date at which VA is authorized to pay benefits. Congress said the number of days you have to go from the BVA to the CAVC was a fixed number, and I believe the Supreme Court has said that that's equitably tolerable. That's correct, Your Honor. Why isn't 5110 equitably tolerable under Henderson? Well, in McKay, this court actually looked at the question whether 5110 operates like a statute of limitations, like that time period for which an appellant has to file an appeal, and explained that 5110 is not a statute of limitations, which cuts off an appellant's right to seek review. A veteran can file a claim at any point in time, 50 years after service, if that happens to be the case. So this court, albeit before Henderson, did look at whether 5110 might operate like a statute of limitations, and for that reason might be subject to tolling, and the court said no. And Congress has set that limitation upon, had that limitation on the books, for the VA cannot pay benefits earlier than the date of... You're arguing it's more like a statute of repose than a statute of limitation. In a way, but more fundamentally, it's that based upon this court's precedent, and also very longstanding rule, 5110 in its current version has been in the statute since the 1950s, but before that was part of the VA regulations since the 30s. What about Mr. West's due process argument? He says as a matter of due process of law, he was deprived of his opportunity to have an earlier filing date. Because the secretary didn't bother to tell him that in 1996 he could have gone on file. We have several responses to that argument. First, we should point out that that is a new argument in the reply brief. In the opening brief and before the Veterans Court, Mr. West argued the equitable nature of the equitable relief aspect of 793, the Espionage Act. But that is a new argument. Nonetheless, turning to the merits of that argument, it's our position that it's constitutional in name only. It's simply reiterating this argument that 5110 should not apply to him, should not set the effective date for equitable reasons. Mr. West, there is no statutory or regulatory right to receive notice that you are, as a veteran, able to file a claim for benefits. Now, since 1970, VA has had a policy in place of advising veterans. Would a veteran be deprived of due process of law if the veteran is in a position where they say, I want to go file my claim at the RO to get my effective date going? And he happens to say that while he's on, let's assume he's an officer, so he's visiting an officer's club or the PX at a base. And an officer hears him say that, and so they put him in the brig, they lock him up. Because they don't want him to go file and get an earlier effective date. Would that be a violation of his due process rights? Prohibited from filing his claim? As far as the physical prohibition of being locked up, frankly, I'm not sure. But as far as the hypothetical where an officer, for example, might tell someone, you're not allowed to file a claim for benefits, no, that would not be a due process violation. I think our first response to that would be, it would just be erroneous advice. I mean, here... That's because of the case law that says you can't trust what a government official tells you. Well, OPM versus Richmond, Your Honor. That's the reason why I asked him. He's arguing that he was, in effect, physically restrained. He knew full well, or he feared that if he went and filed a claim while a criminal statute was there, he was going to be physically restrained by the people who charged him with a violation of the criminal law. And we disagree with that characterization. 793, the Espionage Act, says that an individual cannot disclose information that would be injurious to the United States or advantageous to a foreign nation. Now, as this Court has already discussed with Mr. West this morning, the letter that he claims released him of the obligations of the Espionage Act, which doesn't mention that act anywhere. It simply says you can give the name and location of your command and dates and related information. That letter came in 1996. Well, at that time, Mr. West had already filed a claim in 1994, and he gave VA the very information that the letter later said he was able to give. So the record evidence doesn't support his contention that he could not file a claim because, in fact, he filed a claim giving that very same information just two years earlier. And your argument would be his due process claim ought to be against whoever it was that told him he could file it, should have told him sooner, not that the government did it? Well, more fundamentally than that, we disagree with the factual assumption that anybody told him he could not file a claim. He's not pointed to any evidence that he was instructed not to file a claim. Rather, he says he couldn't discuss his participation in Operation Dominic, or he believed he couldn't discuss that participation until the 1990s. Well, he filed in 1994, so he's entitled to an effective date going back to then, right, if he can prove a claim? If he can prove a claim, he can go back to the date of his claim. Now, he had two claims here, and I believe the current effective date of his psychiatric claim, which is the one at issue, is 1995, which is when VA found that he filed an informal claim for those benefits. But that's still 1995. It's still a year before the letter from the Secretary? Yes, Your Honor. Yes, Your Honor. You mentioned earlier, if I can shift gears just quickly, you mentioned a case dealing with the question of whether 5110 was subject to waiver. You said we had decided, and I missed the name of the case. It is McKay v. Brown, a 1997 case. Okay, thank you. And in that case, the veteran claimed that he had not filed his claim because he had Agent Orange-related disabilities, and the government was not at that time recognizing any link between his disabilities and Agent Orange. So in effect, he thought filing a claim would be pointless and sought to have the court go around 5110 for equitable reasons. I actually remember that. I also noticed, and I just do want to finish up this point, that since, rather, I mentioned that since approximately 1970, VA has had a policy of informing veterans upon their discharge of their right to file for VA benefits. But this court in Andrews v. Principi has held that that provision, even statutory, it's hortatory, and that where a veteran does not receive that notice upon leaving service, there's no basis for an earlier effective date. That's not a basis either for equitable relief from 5110. So to the extent that Mr. West claims there's some due process right here, again, we think it's constitutional in name only and that the court has essentially rejected the same argument in the past. Can I ask about the full body scan issue? I know that you say that there was this present assessment of, he's got a present record of zero from the past, but since then he's got the 550 skin test, right? Yes, Your Honor. So is the, you may not want to answer this, but it means that I ask his counsel the same thing. Is the door actually barred to him? For example, can he go back to an RO and say, I have a 550 skin assessment, I'd like a full body assessment? Yes, he could ask for that. As I pointed out, he has received a full body estimate, so the request would be more in the nature of, I have 550 skin, I find it difficult to believe that the whole body estimate is zero. I'd like a revised one because the zero was based on, you know, on nothing relating to my exposure at all, just not having the evidence. That's right. He could certainly make that request. And they turn him down and then he has an appeal and he comes right back to the whole system again. Right. I do believe it's likely that the VA would deny that request because dose estimates are only required to be provided for radiogenic diseases, or diseases for which there is some medical evidence linking the current condition to radioactive exposure. And as the Veterans Court explained, in this case, the additional disabilities for which Mr. West seeks benefits, none of those are recognized radiogenic diseases. 550 rem is a really large amount. I don't know if you've looked at this, but you recognize that's a very substantial number. That's my understanding. Yeah. I mean, it's not like a trip to the dentist for a couple of x-rays. It's sort of hard to believe that you would have an exposure estimate in that range and then have zero below the skin level. It sounds odd, but the- It sounds, in fact, scientifically implausible to me. I'm not an expert, but that- Sorry, I didn't mean to- Go ahead. As the Defense Threat Reduction Agency Operating Manual explains, that's cited in our brief, different types of radioactive particles penetrate to different depths within the skin, and so that's how they- Right, but by and large, thermonuclear devices are not real discriminatory in terms of their only going skin deep. I mean, there are a lot of people who have had substantial exposure through- exposure to weapons testing and so forth that has been more than just skin deep, as I understand the science, and it just strikes me as peculiar if those numbers really are. They just seem hard to square with one another. I would think that the VA might look somewhat skeptically at the juxtaposition of 550, on the one hand, and zero on the other. Now, I recognize that the 550 was an up to 550, which doesn't necessarily put him at 550, but nonetheless, if you conclude, as Mr. Walsh has suggested, that what they're really saying is he's in the neighborhood of 550, that's a very large number. Well, and it might well be that if- he will die within a matter of weeks from that kind of exposure. It might well be that if he were to go back to VA and say, I've challenged the whole body estimate that VA would request some further review by the Department of Defense, but- But you seemed skeptical of that earlier when you answered Judge Portman, by saying you expected the VA would say no. I think it's less likely that VA would grant that, but in any event, the whole body dose estimate and the skin estimate were provided to VA by DTRA, and now the Veterans Court has made factual findings of those estimates, and that's simply unreviewable at this level. For these reasons, we ask the court to affirm the decision below. Thank you. Mr. Walsh, a couple of minutes if you need them. Very briefly, please, the court. Well, Mr. West is entitled to his lay observation, which are included in the transcript of his testimony. He lost all his hair. He vomited. He was hospitalized. He almost died. He had a perfectly normal child before he was irradiated. He had two children with birth defects. He now has grandchildren with birth defects, one who's fighting for her life with cancer right now. So we think that the 550 concession was a wonderful thing, but it's ham and eggs. You know, we need the other half of the meal. There's certainly a moral and an ethical obligation on the part of the government of these United States to furnish that test. Whether there's a legal obligation is for this court to say. We have gone back informally at the regional office level and attempted to get them to do that by cajoling them. They seem not to be willing to do that. What is it that you think is the fundamental flaw with the zero that they gave that was recited in Judge Ivor's opinion? Well, because the two are scientifically inconsistent. It is a matter of physics. You can't have 550 exposure on your skin. And by the way, the medical presentations of this appellant are consistent with up there in the range of, you know, 350, 400. I mean, he almost died. He certainly, he's immune compromised now. He's been plagued by illness all his life because of it. But I guess what I'm really getting at is, what is it that you would say other than that it's just wrong? I mean, is there a way to impeach the statement that shows up on page two of Judge Ivor's opinion that in September 2006, the DTRA provided a reconstructed whole body dose estimate for appellant of zero and then references the records. What is it that, wherein lies the flaw? Do you think that they did bad science or they didn't have some critical element of necessary analysis or do you know? Well, they didn't have his testimony. And I think somebody at DTRA finally picked up the file, read his testimony, looked at his actual badge because he has refuted that badge number. It was probably one that was never taken out of the lead foil. And he said, that wasn't my badge number. I wrote it down and he remembered that four-digit number. And it's in the record, in the transcript. So somebody went back and looked and they said, look, this guy was at the airstrip on Johnston Island. We gave him some dark glasses. He stood there and watched an H-bomb go off that threw a 75,000-foot-high mushroom cloud, the strongest ever blown on earth. He was absolutely irradiated. And like I said, he's lucky to be alive. So that's his Jendro, that's his Buchanan. You know, he's entitled to that. He's also studied this stuff and he's worked on this pretty hard to understand that, you know, that interaction between the physics of it and the health science of it. And the experts we've talked to said, look, without that whole body radiation calculation, which we make in all of our oncology work, you know, because we set the upper limits and we know we can only radiate in this area for so much time or else we'll cause these problems. If we don't have that data, only DTRA and their SAIC contractor have it. The government holds the data. If they won't make the calculation, well, we can't get it. It's classified. We can't get discovery on it. So this man, I think it's purely adversarial. I think we're right back to Hodge here. You know, this is adversarial, and that's all it is. They haven't said that we give these calculations out all the time. We're just not going to give you an accurate one in this case. Thank you. Thank you, Mr. Welch. We thank both counsel. The case is submitted. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock AM. Good night. Good night.